HANSEN, Circuit Judge.
This dispute involves a disabled student’s right to a free appropriate public education within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487 (Supp. Ill 1997). The Neosho R-V School District (hereinafter “the School District”) appeals the district court’s[2] judgment that it failed to provide Robert Clark with a free appropriate public education and awarding attorneys’ fees and costs to Robert Clark’s parents (hereinafter “the Clarks”). The Clarks cross appeal the denial of their request for expert witness fees. We affirm.
I.
Robert Clark was a twelve-year-old special education student in the Neosho R-V School District during the 1997-98 school year. Because he suffers from Autism-Asperger’s Syndrome, Robert is prone to inappropriate behavior, which, when un-managed, largely prevents him from interacting with his peers in an acceptable manner. He also is diagnosed as having a learning disability. During the 1997-98 school year, Robert’s age was equal to children in the sixth grade, but he was placed in the fifth grade resource room for *1025 special education. His instructional level was that of fourth grade, but he needed assistance with this work, and the special education teacher often moved him back to third-grade level work to decrease his mis-behaviors and to increase his self-confidence.
Before the school year began, Robert’s parents had initiated a due process proceeding against the School District, which resulted in a settlement agreement providing that the School District would place Robert in a self-contained classroom with mainstreaming in music. The settlement agreement also provided for a full-time paraprofessional to help Robert in school and required the School District to provide specific interventions and strategies to manage Robert’s inappropriate behavior. In August 1997, and again in October 1997, the School District developed Individualized Education Plans (IEPs) for Robert. Consistent with the settlement agreement, the IEPs placed Robert in a self-contained classroom except for music class, established an IEP team to meet every two weeks and consider the possibility of additional mainstreaming, and called for a full-time paraprofessional to accompany Robert in all classes. The IEPs also stated that a behavior plan was attached to them, but the attachments were merely short-term goals and objectives that did not provide specific interventions and strategies to manage Robert’s behavior problems.
Robert’s special education teacher, Mrs. Sweet, and his IEP-required paraprofessional, Larry Shadday, attempted to manage Robert’s behavior problems to the best of their ability. They employed several methods that might be found in a behavior management plan but which had not been actually analyzed or approved by Robert’s IEP team. They also used a checklist that had been included in a plan developed during the prior school year by an outside agency, the Judevine Center for Autism. The IEP team never adopted this document and had agreed that a new behavior management plan was necessary to meet Robert’s needs during the 1997-98 school year. The IEP team agreed that the new plan should not be based on Robert’s past behavior. Robert’s special education teacher did not begin to formally chart data in a format that could be used to develop a new behavior management plan until March 1998.
As the 1997-98 school year progressed, Robert’s behavior problems increased dramatically. His challenging behaviors numbered 3 in the month of August, 10 in the month of September, and 394 by March. The School District did not attempt to formulate a new behavior management plan for Robert until April 1998, close to the end of the school year. Robert’s increasingly inappropriate behavior prevented him from being included in mainstreamed classes beyond music and substantially interfered with his ability to learn.
The Clarks sought an administrative hearing as provided by the IDEA. See 20 U.S.C. § 1415(f). Before the hearing, the Clarks were seeking, among other things, a private placement for Robert or a more inclusive placement within the district. By the time of the administrative hearing, the issues had been narrowed to the question of whether the School District had provided the required behavior management plan necessary to ensure that Robert received a free appropriate public education.
At the hearing, the Clarks presented the expert witness testimony of Dr. Lonny Morrow. In his opinion, Robert’s autism and resulting challenging behavior required the adoption of a formal behavior management plan that would include a functional behavior assessment and develop consequences and reinforcements ap *1026 propriate to Robert’s disability. The three-member state administrative panel chose to credit this expert testimony. Based on this testimony, the panel found that although the IEPs identified some goals and strategies for dealing with Robert’s behavior problems, these were insufficient to qualify as a cohesive behavior management plan. The panel also found that the School District’s late-in-the-year attempt to formulate the required behavior management plan was insufficient to meet Robert’s needs.
The School District contended that Robert’s academic record demonstrated he had received some benefit from his education, even if the behavior plan did not meet the expert’s requirements. The administrative panel did not credit that evidence, finding it contradicted by other evidence and unsupported by the record as a whole. The panel found that the conflicting evidence left it with no clear evidence from which it could determine if or to what extent Robert had progressed or obtained any educational benefit.
Thus, the administrative panel concluded that the School District failed to develop and implement the required behavior management plan calculated to meet Robert’s needs and to enable him to gain an educational benefit. The panel ordered the School District to seek the expertise of a consultant or qualified expert to devise a behavior management plan including (1) an ongoing functional behavior analysis to identify causative factors and objectionable behaviors, and (2) a list of replacement behaviors and strategies to eliminate Robert’s objectionable behavior and enable him to receive educational benefits. The panel also ordered the School District to provide its staff with development training for working with students who have Asper-ger’s Syndrome and high functioning autism.
The School District brought suit in federal district court, seeking judicial review of the administrative panel’s decision. See 20 U.S.C. § 1415(i)(2). On cross motions for summary judgment, the district court affirmed the panel decision that the School District had failed to provide Robert with a free appropriate public education. The district court concluded that the Clarks were prevailing parties and ordered the School District to pay attorneys’ fees of $15,689.50. The district court denied the Clarks’ request for expert witness fees. The School District now appeals, and the Clarks cross appeal the denial of their request for expert witness fees.
II.
A. Free Appropriate Public Education
One purpose of the IDEA is “to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs.” 20 U.S.C. § 1400(d)(1)(A). States accepting federal funding under the IDEA must “provide a disabled student with a free appropriate public education.” Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1034 (8th Cir.2000); see also 20 U.S.C. § 1412(a). Congressional policies indicate a preference for educating disabled children in a mainstreamed classroom whenever possible. Gill, 217 F.3d at 1034; 20 U.S.C. § 1400(c)(5)(D). A team must develop a specialized course of instruction, known as an individualized education program, or “IEP,” for each disabled student, taking into account that child’s capabilities. Gill, 217 F.3d at 1034; 20 U.S.C. § 1414(d).
In a suit by an aggrieved party under the IDEA, the court engages in a twofold inquiry, asking (1) “has the State complied with the procedures set forth in *1027 the Act?” and (2) is the IEP “reasonably calculated to enable the child to receive educational benefits?” Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 8034, 73 L.Ed.2d 690 (1982). “If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.” Id. at 207, 102 S.Ct. 3034. While the IDEA requires school districts to provide disabled children with a free appropriate public education, it “does not require that a school either maximize a student’s potential or provide the best possible education at public expense.” Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir.1997), cert. denied, 523 U.S. 1137, 118 S.Ct. 1840, 140 L.Ed.2d 1090 (1998). Instead, the requirements of the IDEA “are satisfied when a school district provides individualized education and services sufficient to provide disabled children with ‘some educational benefit.’ ” Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir.1999) (quoting Rowley, 458 U.S. at 200, 102 S.Ct. 3034).
In this case, there is no contention that the school district failed to follow the procedures set forth in the IDEA. Rather, the dispute involves the second inquiry-whether the August and October 1997 IEPs were reasonably calculated to enable Robert to receive an educational benefit. The district court determined that because the IEPs required a behavior management plan and because the attachments to the IEPs did not qualify as such and no approved plan was timely developed, the IEPs were not reasonably calculated to provide an educational benefit.[3]
The School District asserts that, contrary to the district court’s ultimate conclusion, Robert’s IEPs were reasonably calculated to provide Robert an educational benefit. Specifically, the School District asserts (1) that the district court erred in giving deference to administrative panel findings of no educational benefit because those findings were contradicted by the evidence, (2) that the IEPs appropriately addressed Robert’s behavior problems, and (3) that the district court erred in concluding that the School District denied Robert a free appropriate public education.
We review de novo, as a mixed question of law and fact, the ultimate issue of whether an IEP is reasonably calculated to provide some educational benefit. Gill, 217 F.3d at 1035 (citing Fort Zumwalt, 119 F.3d at 611, and Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir.1996)). “[T]he district court’s findings of fact are binding unless clearly erroneous.” Id. The district court must receive the record of the state administrative proceed *1028 ings and any additional evidence at the request of either party. 20 U.S.C. § 1415(i)(2)(B). Then, basing its decision on the preponderance of the evidence, the district court “shall grant such relief as the court determines is appropriate.” Id. While courts are required to make an independent decision based upon a preponderance of the evidence, the fact that the statute requires the reviewing court to receive the administrative records “carries with it the implied requirement that due weight shall be given to these proceedings.” Rowley, 458 U.S. at 206, 102 S.Ct. 3034 (emphasis added), see also Fort Zumwalt, 119 F.3d at 610. This ensures that courts will not “substitute their own notions of sound educational policy for those of the school authorities which they review.” Rowley, 458 U.S. at 206, 102 S.Ct. 3034. Thus, the statutory obligation to grant “such relief as the court determines is appropriate” largely references the statute’s procedural obligations; it does not permit the court to exercise a free hand in imposing substantive educational standards. Id.
We have noted that the district court’s standard of review under the IDEA is less deferential than the substantial evidence test ordinarily applied in federal administrative law cases. Blackmon, 198 F.3d at 654. At the same time, however, courts are admonished to be mindful that they lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy. Id. at 654-55. Additionally, a district court should give consideration to “the fact that the state hearing panel has had the opportunity to observe the demeanor of the witnesses.” Fort Zumwalt, 119 F.3d at 610.
In this case, the district court was careful not to substitute its own notions of educational policy for those of the trained educators, and we conclude that the district court gave due weight to the administrative hearing panel’s findings that Robert did not receive an educational benefit. The parties presented no additional evidence to the district court, and the district court’s written order evidences an independent review of the administrative hearing record. The district court concluded that the record supported the administrative panel’s decision to discount the evidence of Robert’s alleged academic progress, and it gave deference to the panel’s determination that the materials attached to the IEPs did not constitute a proper behavior management plan. The district court stated that because those decisions were supported by evidence in the record, to do otherwise would be “to substitute its views regarding proper educational methods and programs for the Panel’s views on those topics.” (Appellant’s Add. at 6.) While the record is certainly not one-sided on the issue of whether Robert received an educational benefit, we agree that on the whole, the record supports the credibility assessments and findings made by the administrative panel and deferred to by the district court.
The School District’s arguments that the IEPs appropriately addressed Robert’s behavior problems and that the district court erred in concluding that the School District denied Robert a free appropriate public education are intertwined. Our independent review convinces us that because the IEPs did not appropriately address his behavior problem, Robert was denied a free appropriate public education.
The Clarks’ expert witness testified that the papers attached to the IEPs were not sufficient to amount to a cohesive behavior management plan. Witnesses confirmed that such a plan was never adopted by the IEP team, in spite of the fact that Robert’s behavior problem was the major concern at every IEP meeting. Although the special education teacher and the paraprofes *1029 sional commendably attempted to cope with Robert’s behavioral problems using methods that could have been employed in a behavior management plan, they were not professionally trained to successfully reduce the inappropriate behavior in a manner fitting to Robert’s disabilities. The fact that no cohesive plan was in place to meet Robert’s behavioral needs supports the ultimate conclusion that he was not able to obtain a benefit from his education.
Our review indicates that the administrative panel’s decision reflects a thorough consideration of all the evidence regarding Robert’s academic progress and his behavioral problems. The panel discounted the evidence of some slight academic progress, finding that this evidence of progress was contradicted by other evidence in the record. The record demonstrates that every time Robert’s special education teacher advanced his work to a fifth-grade level, the stress engendered resulted in behavior problems that forced the teacher to readjust his work back to fourth-grade levels (which he needed assistance to complete) and even to third-grade levels to afford Robert a measure of success.
The School District points to report cards which assertedly indicate a measure of success sufficient to be considered an educational benefit, regardless of whether the IEP stated a behavior management plan. The administrative panel reviewed all of this evidence in a detailed fashion and discounted it because the records did not indicate at which grade level Robert was working at any given time or over any period of time. The records also indicated that work at higher levels was only possible with a great deal of help from the paraprofessional.
The special education teacher stated generally that she thought Robert had attained some benefit academically, and her records indicated that some short-term objectives had been met. She admitted, however, that whenever she attempted to advance Robert’s work, his behavior problems worsened and prevented independent success at any'level beyond third grade. Robert’s mother also stated generally that she thought Robert had made “some” progress during the 1997-98 school year. (Appellant’s App. at 249.) She qualified her answer, clarifying that she sought more integration for him not because she felt Robert had progressed, but because she was certain that he could progress if given more mainstream classroom opportunities, which would only be possible with a proper behavior management plan.
Kerri Muns, the director of the Southwest Missouri Autism Project, was involved with the Judevine Center for Autism and had attended Robert’s IEP meetings at the request of his parents. She testified that Robert’s behavior problems always precluded him from attending a regular classroom, which was the main goal of his IEPs. She opined that Robert had progressed “in a very broad sense” (id. at 180), noting that he now could start a conversation and look a person in the eye, which he could not do at the beginning of the year. On the other hand, his short attention span had not increased.
The administrative panel concluded that the generalized opinions of progress expressed by some witnesses at the hearing were “meaningless” in light of all the other evidence in this case. (Appellant’s Add. at 28.) Our review of the record convinces us that the panel did not err in discounting the evidence of de minimis academic and social progress where the panel pointed to specific evidence in the record contradicting such a benefit and noted that any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with his ability to obtain a benefit from his education. The district *1030 court considered not only the administrative panel’s conclusions, but also the hearing record to reach its own conclusion that “the need for-and the ability to create-a proper behavior modification plan existed long before [the School District] made the effort to [create a plan].” {Id. at 5.) Upon de novo review, we agree that the School District failed to provide Robert an educational benefit by not developing and implementing an appropriate behavior management plan as required by his IEPs.
B. Attorney Fees
The IDEA provides that “the court, in its discretion, may award reasonable attorneys’ fees as part of the costs to the parents of a child with a disability who is the prevailing party.” 20 U.S.C. § 1415(i)(3)(B). “We review de novo the determination of prevailing party status.” Birmingham v. Omaha Sch. Dist., 298 F.3d 731, 734 (8th Cir.2002). “A litigant is a ‘prevailing party’ if he obtains ‘actual relief on the merits of his claim that materially alters the legal relationship between the parties by modifying the defendant’s behavior in a way that directly benefits the plaintiff.’ ” Id. (quoting Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)) (alterations omitted).
The School District argues that the district court erred in determining that the Clarks were the prevailing parties and abused its discretion by awarding attorneys’ fees that were not reasonable in light of the Clarks’ limited success. The School District further asserts that even if this court affirms the conclusion that it did not provide Robert with a free appropriate public education, the fees and costs must be reduced. We respectfully disagree.
Even though the Clarks began the process seeking relief such as a private placement or an inclusive placement within the district, the record demonstrates that the only issue in dispute at the administrative hearing was whether the attachments to the IEPs satisfied the requirement of providing Robert with a proper behavior management plan. The Clarks prevailed on this issue. There is no assertion that the School District offered a behavior management plan by way of settlement, aside from the vague propositions already contained in the IEPs. When the administrative panel ordered the School District to consult an expert and devise a proper behavior management plan, it altered the legal relationship between the parties by granting Robert a legal right previously denied him by the School District’s failure to devise and implement a behavior management plan. This amounts to actual relief on the merits of Robert’s IDEA claim, and thus the district court properly determined that the Clarks were the prevailing parties and correctly granted an award of attorneys’ fees.
We review the award of attorneys’ fees for an abuse of discretion. Birmingham, 298 F.3d at 734. The district court awarded only 40% of the amount of attorneys’ fees that the Clarks sought. According to the district court, this reduction properly reflected that much of the prehearing work was spent on issues that were not ultimately tried or prevailed upon in the administrative hearing. We find no abuse of discretion.
The School District argues that the Clarks unreasonably protracted the proceedings, and thus the fees should be further reduced. If parents “unreasonably protract[] the final resolution of the controversy,” the court shall reduce the fee award accordingly. 20 U.S.C. § 1415(i)(3)(F). The School District asserts that the Clarks waited too long to narrow the issues to the one on which they prevailed and that they unreasonably refused a good faith offer to settle. The district court has already discounted the *1031 award of attorneys’ fees for work on unsuccessful or abandoned claims, and the district court stated that “[t]here is no indication that Plaintiff ever offered the relief ultimately ordered by the hearing panel, much less any indication that Plaintiff made a written offer to settle that issue.” (Appellant’s Add. at 18.) For the same reason, the district court refused to deny attorneys’ fees under 20 U.S.C. § 1415(i)(3)(D), which provides that attorneys’ fees must be denied when a party refuses a settlement offer and the court finds that the offer of settlement was more favorable than the relief finally obtained. The court did not so find, and we see no abuse of discretion in that decision.
C. Expert Witness Fees
The Clarks cross appeal, asserting that the district court abused its discretion in denying their request for expert witness fees as costs. Whether expert witness fees may be awarded as costs under the IDEA is an issue of first impression in this circuit. See Warner v. Indep. Sch. Dist. No. 625, 134 F.3d 1333, 1336 n. 1 (8th Cir.) (noting the issue but concluding that we did not need to address the issue at that time given our disposition of that case), cert. denied, 525 U.S. 823, 119 S.Ct. 67, 142 L.Ed.2d 53 (1998). In fact, our research indicates that no circuit court has yet ruled on the issue. Among the district courts there is a split of authority on whether reasonable expert witness fees are payable under the IDEA. See BD v. DeBuono, 177 F.Supp.2d 201, 207 (S.D.N.Y.2001) (citing cases on both sides of the issue).
The statute at issue is labeled, “Award of Attorneys’ Fees,” and it provides that “the court, in its discretion, may award reasonable attorneys’ fees as part of the costs to the parents of a child with a disability who is the prevailing party.” 20 U.S.C. § 1415(i)(3)(B). This language “assumes, by its construction, that costs include something more than attorney’s fees,” but the IDEA does not specifically authorize an award of costs or define what items are recoverable as costs. Pazik v. Gateway Reg. Sch. Dist., 130 F.Supp.2d 217, 220 (D.Mass.2001). “Costs,” however, is an ordinary term with which federal judges are well acquainted, and the necessary statutory authority to award them resides elsewhere in the Code. Absent a specific definition of costs, we look to the general provisions providing for the taxation of costs in federal courts as a matter of course. Title 28 U.S.C. § 1920(3) (2000) provides for payment of witness fees, and 28 U.S.C. § 1821(b) (2000) limits that payment to a $40 per. day attendance fee. The IDEA provides no explicit authority to exceed this amount for expert witnesses, and the Supreme Court has held that “absent explicit statutory or contractual authorization for the-taxation of the expenses of a litigant’s witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920.” Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) (emphasis added).
The dissent asserts that these general provisions governing costs in federal court do not apply here because § 1821 is limited in relevant part to the cost of “a witness in attendance at any court of the United States, or before a United States Magistrate.” 28 U.S.C. § 1821(a) (emphasis added). Because the expert witness in this case appeared in the state due process hearing and not in federal court, the dissent says we should avoid the applicability of the provisions of the general cost statutes. While the emphasized language of § 1821 is undeniable,- we conclude that it poses -no impediment to the application of the statute to the present case. In our view, the specific language of the IDEA broadens the' application of the general cost statutes by permitting the court to “award reasonable attorneys’ fees as part *1032 of the costs” “in any action or proceeding brought under this section.” 20 U.S.C. § 1415(i)(3)(B) (emphasis added). Thus, it is our understanding that Congress’s use of the undefined term “costs” points us to the general cost statutes and specifically broadens their applicability to all federal actions or state due process “proceedings” provided for in the IDEA.
The Clarks urge us to look to the legislative history, which they assert provides clear intent that Congress sought to include expert witness fees as costs under the IDEA. A House Conference report states as follows:
The conferees intend that the term “attorneys’ fees as part of the costs” include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian’s case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.
H.R. Conf. Rep. No. 99-687, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 1807, 1808. In another context, Justice Scalia commented for the Court in a footnote on this particular bit of legislative history. He characterized it as “an apparent effort to depart from ordinary meaning and to define a term of art,” and he also stated that “th[is] specification would have been quite unnecessary if the ordinary meaning of the term included those elements.” West Virginia Univ. Hosps. v. Casey, 499 U.S. 83, 92 n. 3, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), superseded by statute on other grounds, 42 U.S.C. § 1988(c) (1994). We conclude that this “apparent effort” to define a term of art in legislative history is an unsuccessful one. It is not the kind of “explicit statutory” authorization the Supreme Court said in Crawford was necessary to exceed the limitations of the general cost statutes.
Proper respect for the legislative powers vested in Congress “implies that statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.” United States v. Albertini, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (internal quotations and alterations omitted). There is no doubt that Congress knows how to specify a shifting of expert witness fees. West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 88-89, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (noting that “[a]t least 34 statutes in 10 different titles of the United States Code explicitly shift attorney’s fees and expert witness fees”), superseded by statute, 42 U.S.C. § 1988(c) (1994) (providing explicitly for an award of expert witness fees). Yet, the fee shifting statute at issue here provides no explicit authorization of expert witness fees. “We must assume Congress understood the meaning of the words it incorporated into the Act.” Welsh v. Boy Scouts of America, 993 F.2d 1267, 1270 (7th Cir.) (internal quotation and alteration omitted), cert. denied, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). Nothing in the plain language of the statute indicates that the district court is authorized to exceed the limitations set out in § 1821 and § 1920.
Absent some ambiguity in the statute, we have no occasion to look to legislative history. The dissent would find ambiguity in the term “costs,” but that general term is governed by the general cost statutes, and there is no contrary indication in the IDEA. “Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete.” Burlington N. R.R. v. Okla. Tax Comnn’n, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (internal quotations and altera *1033 tions omitted). We refuse to accept legislative history alone as an acceptable exceptional circumstance. We are bound to follow circuit precedent, which states that “[t]he mere fact that statutory provisions conflict with language in the legislative history is not an exceptional circumstance permitting a court to apply the legislative history rather than the statute.” United States v. Erickson P’ship (In re Erickson P’ship), 856 F.2d 1068, 1070 (8th Cir.1988). “We refuse to read into the statute what Congress has declined to include.” Welsh, 993 F.2d at 1270. This is particularly true where the Court has specifically indicated that the term “costs” should be construed narrowly as not including expert witness fees. See Casey, 499 U.S. at 87 n. 3, 111 S.Ct. 1138 (relying on Crawford Fitting to reject a claim that the generic term “costs” might include expert witness, fees: “We are aware of no authority to support the counter-intuitive assertion that the term ‘costs’ has a different and broader meaning in fee-shifting statutes than it has in the costs statutes that apply to ordinary litigation.” (internal quotation and alteration omitted)). In truth, it is the conferees’ language which creates the asserted ambiguity, not the statute’s use of the word “costs.”
The observations of the Seventh Circuit are particularly relevant here:
We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law. We must refuse to infringe on the legislative prerogative of enacting statutes to implement public policy. The problems of public policy are for the legislature and our job is one of interpreting statutes, not redrafting them.
Welsh, 993 F.2d at 1270-71 (internal quotations and alterations omitted).
We thus conclude that the district court did not err in refusing to grant expert witness fees under the IDEA.
III.
Accordingly, we affirm the judgment of the district court in all respects.

. The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

. This case is slightly different in posture from others we have seen because it involves a failure to implement a necessary provision of an otherwise appropriate IEP. See Houston Ind. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 (5th Cir.2000) (setting forth the analysis that a party who is challenging the implementation of an IEP must demonstrate that the school authorities failed to implement a substantial or significant provision of the IEP; and noting that this analysis affords schools some flexibility in implementing IEPs but still holds them accountable for material failures and for providing a meaningful educational benefit), cert. denied, 531 U.S. 817, 121 S.Ct. 55, 148 L.Ed.2d 23 (2000). While the analysis set forth in Bobby R. more accurately suits the posture of this case, the parties did not make this argument. Thus, we confine our analysis to the framework of Rowley, which considers whether the IEP was reasonably calculated to provide an educational benefit. We believe that this analysis is pliable enough to fit the situation at hand and will safeguard the same principles because we cannot conclude that an IEP is reasonably calculated to provide a free appropriate public education if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit.