# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3428

_____

Lathrop R-II School District,    *
                *
    Plaintiff - Appellee,   *
                * Appeal from the United States
   v.            * District Court for the
                * Western District of Missouri.
William Gray, by and on behalf of his *
son, D.G.,         *
                *
    Defendant-Appellant.  *

_____

Submitted: June 17, 2010
Filed: July 2, 2010

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

  William Gray alleges that his son D.G., a student with autism, was not provided a free appropriate public education (FAPE) by Lathrop R-II School District (the District) as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.* He and D.G.'s mother brought a successful challenge through an administrative hearing process. The district court[1] reversed the decision of the administrative panel, and Gray appeals. We affirm.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

I.

In fall 2000 D.G. transferred to the District from Putnam County School District (Putnam) as a fourth grader. He had been educated at Putnam under an Individualized Education Plan (IEP) as required by the IDEA for students with disabilities. 20 U.S.C. § 1414(d)(2)(A).[2] An evaluation of D.G. at Putnam in 1999 determined that although he could read words comfortably at the third grade level, his comprehension was at a pre first grade level. He did not know the value of coins. D.G.'s last IEP from Putnam described him as engaging in disruptive behaviors. He did not acknowledge his peers, and his speech was echolalic and robotic.

D.G. was among the first students with autism in the District. Anticipating his arrival, Special Services Director Dr. Ken Quick and other District employees enrolled in autism training. The District's first IEP for D.G. included occupational and speech language therapies and a full time paraprofessional. D.G. was to spend 65% of his day in the special education classroom of Cindy Nance and some time in "regular" education classes.

Nance, who had over two decades of experience teaching students with disabilities, noticed that D.G. exhibited behaviors similar to those described by Putnam. For example, D.G. would bite his finger when in the regular education classroom, recite from movies, and engage in loud outbursts. According to Nance these behaviors were severe and impeded D.G.'s ability to learn. By December 2001 D.G. also began to exhibit sexual behaviors at school, including touching his penis.

Katie Alexander, D.G.'s occupational therapist from 2000-2002, attempted to address D.G.'s sexual behaviors, but the District hired Marilyn Stubbs, an autism and

---

[2]We refer to those versions of statutes and regulations in place during the time period at issue.

behavioral specialist, in April 2002. She conducted a functional behavior assessment (FBA) of D.G.'s sexual behaviors, collecting eight weeks of daily data from District staff, observing the student, and consulting with Gray (D.G.'s father). Based on her data Stubbs developed a behavior plan designed to decrease D.G.'s inappropriate behaviors and increase appropriate behaviors. The District implemented her suggested strategies.

D.G.'s IEP team, which included his father, Nance, Stubbs, Alexander, Quick, and "parent advocate" Rand Hodgson, convened in May 2002 to discuss extended school year services (ESY), a behavior plan, and diagnostic staffing. The team deemed D.G. eligible for ESY, discussed his behaviors, and agreed to conduct a full reevaluation of D.G. in fall 2002. The District hired an outside licensed psychologist to evaluate D.G.'s cognitive and adaptive behavioral abilities.

The IEP team met several times later that fall to discuss the reevaluation and prepare D.G.'s IEP. Gray attended each meeting. D.G.'s IEP for the 2002-2003 school year (2002 IEP) included a section titled "Present Level of Performance" describing how his autism impacted his ability to access the general sixth grade curriculum. For example, D.G. was "challenged to participate in activities[] which require gross/fine motor skills" such as art and physical education class.

The IEP also documented D.G.'s progress on his prior IEP goals, incorporated information from the reevaluation, and established a series of goals and objectives. In addition, the 2002 IEP discussed D.G.'s disruptive behaviors, both sexual and nonsexual, and included a behavior plan with strategies to address problems as well as a sensory diet to curb improper behaviors.

D.G.'s IEP for the 2003-2004 school year (2003 IEP) similarly described his present level of performance and noted his progress in both academic and non academic areas. For example, while his 2002 IEP stated that D.G. "demonstrates a

desire for social interaction and a sense of belonging[,]" his 2003 IEP observed that he "has learned to greet people with visual prompts[.]" The 2003 IEP contained a revised behavior plan with strategies and a modified sensory diet. It set academic goals and objectives but also included a separate list of occupational therapy goals. Christi Foreman, D.G.'s speech language therapist for the 2002-2003 and 2003-2004 school years, provided him with daily, thirty minute, one on one sessions.

There is conflicting evidence about whether D.G.'s behaviors improved. Between 2002 and 2003, D.G. spent less time in regular education classes such as physical education. The administrative panel which ultimately ruled against the District nonetheless concluded that D.G. made progress on many of the goals in his 2002 and 2003 IEPs.

In January 2004, Gray and D.G.'s mother requested a due process hearing from the Missouri Department of Elementary and Secondary Education. See 20 U.S.C. § 1415(f); Mo. Rev. Stat. § 162.961. They argued, among other related claims, that the District (1) denied D.G. a FAPE by failing to craft appropriate IEPs for the 2002-2003 and 2003-2004 school years, and (2) failed to provide them adequate prior written notice and excluded and limited their participation during the 2002-2003 and 2003-2004 school years. See 20 U.S.C. § 1415(b); 34 C.F.R. §§ 300.345, 300.503. The parents sought, among other relief, reimbursement for services they allegedly procured and compensatory education and related services.

In March 2004, D.G.'s parents arranged for a representative from Partners in Behavioral Milestones (PBM) to observe D.G. for a few hours. PBM trains education professionals and parents to manage behaviors in children with autism. It also runs an independent academy, the Milestones Academy (Milestones), for such children. At an IEP meeting in May 2004, Gray requested that the District place D.G. at Milestones for the 2004-2005 school year, but the team rejected the proposal in part

on the ground that it was not the "least restrictive environment" as required by the IDEA.  20 U.S.C. § 1412(a)(5)(A).

The three member administrative panel held an eighteen day hearing over the course of several months and rendered its decision in August 2005.  A two member majority concluded that the 2002-2003 and 2003-2004 IEPs were deficient because they lacked "baseline data."  It also concluded that the IEPs denied D.G. a FAPE because they inadequately addressed his behaviors and social skills.  The panel ruled against the parents on their participation and notice complaints, however, as well as their claim for reimbursement for private education expenses.  The panel ordered D.G. to be placed in a state approved agency for students with autism.

The District challenged the panel's decision in federal court.  See 20 U.S.C. § 1415(i)(2).  Gray asserted counterclaims, including an argument that the District violated the IDEA by not immediately complying with the panel's order.  The district court remanded the case because the panel had incorrectly placed the burden of persuasion on the District.  See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005) (burden of proof lies with party challenging the IEP).

On remand the panel upheld its original decision in its entirety.  The District again filed suit and Gray asserted the same counterclaims.  The District moved for summary judgment or judgment on the administrative record, asserting that the panel decision was legally erroneous and unsupported by the evidence.  It also moved for judgment on the pleadings with regard to Gray's counterclaims.  Gray moved for judgment on the administrative record.  The court granted the District's motions, and denied as moot Gray's motion.  Gray appeals.

## II.

While the district court must accord due weight to the administrative panel's decision, the burden of persuasion remains with Gray as the party challenging the IEP, see Sch. Bd. v. Renollett, 440 F.3d 1007, 1010-11 (8th Cir. 2006), and the panel's decision must be based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii). "Whether a school district has offered a free appropriate public education is a mixed question of fact and law and the district court's ultimate determination is reviewed de novo." Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 611 (8th Cir. 1997). When reviewing a summary judgment we view the evidence and draw all reasonable inferences in the light most favorable to the non moving party, affirming only where the movant is entitled to judgment as a matter of law. M.P. ex rel. K. v. Indep. Sch. Dist. No. 721, 326 F.3d 975, 979 (8th Cir. 2003).

The IDEA entitles students with disabilities to a FAPE. Because each child's needs and abilities are unique, however, the law does not mandate the acquisition of specific knowledge or "strict equality of opportunity or services." Bd. of Educ. v. Rowley, 458 U.S. 176, 198 (1982). "[T]he IDEA does not require that schools attempt to maximize a child's potential, or, as a matter of fact, guarantee that the student actually make any progress at all." CJN v. Minneapolis Pub. Sch., 323 F.3d 630, 642 (8th Cir. 2003); see also 34 C.F.R. § 300.350.

The IDEA's legal obligations are fulfilled when the school district (1) complies with the law's procedures in developing an IEP, and (2) the resulting IEP is "reasonably calculated to enable the child to receive educational benefits[.]" Rowley, 458 U.S. at 207. "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." Indep. Sch. Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 562 (8th Cir. 1996) (quotation omitted).

Gray first argues, as the administrative panel concluded, that D.G.'s 2002 and 2003 IEPs were procedurally flawed because they lacked "baseline data." The IDEA does not explicitly mandate such specific data, however. What it does require is "a statement of the child's present levels of educational performance," including "how the child's disability affects the child's involvement and progress in the general curriculum[,]" and "a statement of measurable annual goals, including benchmarks or short-term objectives[.]" 20 U.S.C. § 1414(d)(1)(A).

A preponderance of the evidence establishes that the challenged IEPs contained both detailed present level statements and measurable goals. The section on D.G.'s present levels in his 2002 IEP was twelve pages long. It elaborated on how D.G.'s disability affected his ability to access the general curriculum and discussed areas including his health, motor skills, sensory processing abilities, cognitive and adaptive behaviors, academic abilities, speech, and social skills. The 2002 IEP enumerated twenty seven distinct and specific goals. Each had internal benchmarks and most indicated D.G.'s present ability relative to the goal. Blank spaces next to the internal benchmarks enabled District staff to record D.G.'s progress ("Met," "Progress," "Slow Progress," or "No Progress"). The 2003 IEP was similarly detailed and thorough.

The panel was concerned that "[i]f an objective states a student will perform a skill, and the student already knows that skill, mastering that objective would not show any progress." It therefore concluded that IEPs must incorporate "baseline data" to establish a starting point for each objective. Gray has not cited any case in which any court has read such an implied requirement into the law. Cf. Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 612 (6th Cir. 2006) (rejecting argument that student was harmed by IEP's lack of "a baseline to measure [his] future progress" where its short term objectives were "capable of measurement" and the student's test results demonstrated that he received educational benefit).

Moreover, the challenged IEPs did contain "baseline data" for many of the goals, as the panel acknowledged. For example, the present level section in the 2002 IEP noted that D.G. could give the correct coinage for a purchase with 60% accuracy, but that he could not fill out a blank check. Two of D.G.'s goals for the 2002-2003 school year were for him to improve his ability to give the correct amount of money for a purchase between $5.00 and $10.00 from 50% to 80% accuracy and to fill out a blank check from 0% to 100% accuracy. As D.G.'s special education teacher Nance explained, if District staff "had not attempted [an] objective" the starting point would be zero. The 2003 IEP's present level section similarly noted that D.G. had learned to fill out a blank check with 100% accuracy and give the correct amount of money for a purchase between $5.00 and $10.00 with 80% accuracy. His 2003 IEP therefore included the goal of improving his ability to give the amount of money for a $20.00-$30.00 purchase from 0% to 80% accuracy.

Neither the panel nor Gray in his appellate brief specified which goals lacked "baseline data." In any event, we will not compel a school district to put more in its IEPs than is required by law. Gray has not met his burden of showing a procedural deficiency in this regard.

The panel also concluded that the IEPs were deficient because they did not sufficiently address D.G.'s behavioral issues. In its view no goal in either IEP related to decreasing D.G.'s disruptive behaviors. The IDEA does not however require an IEP to create specific goals with regard to behavior. If a behavior impedes a child's learning, the IEP team need only "*consider*, when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior[.]" 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis supplied).

D.G.'s 2002 and 2003 IEPs both described his disruptive behaviors and included a host of strategies to address them. They elaborated on D.G's difficulties with social interactions, his adaptive behaviors, and self stimulating behaviors such as finger biting and hand flapping. Both contained a behavior plan with four columns: (1)

"When [D.G.] does this . . ."; (2) "and we think it means . . ."; (3) "we should . ."; (4) "PREVENTATIVE ACTIONS." One preventative strategy involved rewarding and penalizing D.G. with potato chips.

Both IEPs contained a sensory diet with strategies for keeping D.G. on task and preventing disruptions. For example, D.G. was to be given a "fidget box" and was permitted to jump on a trampoline between activities. Other accommodations included special lighting, a private bathroom, weighted lap and shoulder pads, and frequent breaks. The District sent behavior charts home daily from November 2002 through May 2003 and from August 2003 through November 2003. Both the behavior plan and sensory diet were revised in the 2003 IEP.

As evidence that the IEPs inadequately addressed D.G.'s disruptive behaviors, the administrative panel focused on some testimony by District staff that his behaviors continued. As the panel repeatedly stated, however, D.G. progressed in both 2002-2003 and 2003-2004. While academic progress alone does not prove that the child received a FAPE, it "is an important factor in ascertaining whether a disabled student's IEP was reasonably calculated to provide educational benefit[,]" especially where, as here, the student's learning ability is hampered by continual behavioral issues. CJN, 323 F.3d at 638 (quotation omitted).

In CJN, we concluded that even if "more positive behavior interventions could have been employed, that fact is largely irrelevant" where the school district made a "good faith effort" to help the student achieve the educational goals outlined in his IEP. Id.; see also 34 C.F.R. § 300.350(a)(2). The District's good faith effort to enable D.G.'s progress by stemming disruptive behaviors is evidenced by staff autism training and by D.G.'s one on one daily speech language therapy, occupational therapy, one on one full time paraprofessional, and a variety of tailored positive behavioral interventions in a sensory diet and detailed behavior plan. The District also

hired an autism specialist to conduct an FBA of D.G.'s sexual behaviors and a psychologist to evaluate his cognitive and adaptive behavioral abilities.

The IDEA does not mandate the inclusion in an IEP of a behavior plan, see Renollett, 440 F.3d at 1011, let alone behavioral improvements. Nonetheless, while there was conflicting testimony on this issue, both challenged IEPs indicated D.G. had behavioral progress in some areas. The present level section of D.G.'s 2002 IEP noted that D.G. had "decreased the number of disruptive outbursts during speech" and was "able to maintain an adequate distance during therapy session[.]" Two primary concerns of D.G.'s parents had been his verbal communication and social skills. His 2003 IEP noted that D.G. had "made good progress in the area of speech and language." He was able to provide basic information in a personal introduction and "exchange pleasantries with minimal prompting[.]"[3]

Gray cites Neosho R-V School District v. Clark, 315 F.3d 1022 (8th Cir. 2003), in which we concluded that a student was denied a FAPE when the school district did not adequately address a student's behaviors. The challenged IEP in Clark, however, stated that a behavior plan was attached but the attachments "were merely short-term goals and objectives that did not provide specific interventions and strategies to manage [the student's] behavior problems." Id. at 1025. By contrast, D.G.'s IEPs contained extensive behavior plans as well as sensory diets. It is undisputed that D.G. made progress on many of his IEP goals while in Clark there was conflicting evidence about whether there had been meaningful progress. The remedies ordered by the administrative panel in Clark were an FBA, behavioral strategies, and staff training in autism. Id. at 1026. In D.G.'s case these measures were voluntarily undertaken by the District.

---

[3]We agree with the district court that the administrative panel's conclusion that D.G. was denied a FAPE because the IEPs insufficiently focused on his social skills is unsupported by the record evidence and the law.

According to Gray, the district court impermissibly ignored the panel's determinations made in its remand decision (three years after the actual hearing) that the District witnesses were not credible because they were prejudiced in favor of their employer, seemed "rehearsed," and made admissions under cross examination. "The district court must give due weight [to the panel's decision] because the administrative panel had an opportunity to observe the demeanor of the witnesses[.]" Strawn v. Mo. State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000) (quotation omitted).

The district court reached a conclusion contrary to that of the panel not because it rejected its credibility determinations, but because the panel relied on incorrect legal standards. For example, the panel deemed the IEPs deficient because they lacked "baseline data," but the IDEA does not require production of such data. The panel also decided that the IEPs insufficiently addressed D.G.'s behaviors which did not improve. Since D.G.'s IEPs did contain detailed behavioral interventions, and the IDEA does not require behavioral improvement, the panel erred in basing its conclusion on behavioral deficiencies.

The IDEA "does not require that a school either maximize a student's potential or provide the best possible education at public expense." Clynes, 119 F.3d at 612. A school district fulfills its legal duty when, as here, it "provides individualized education and services sufficient to provide disabled children with 'some educational benefit.'" Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir.1999) (quoting Rowley, 458 U.S. at 200). The District met this obligation. The challenged IEPs set out D.G.'s present levels of education and measurable goals for the year, enunciated special services and accommodations for D.G., and adequately considered positive behavioral interventions and strategies.

III.

Gray challenges the conclusion by both the district court and the administrative panel that the District complied with the IDEA's requirement of parental participation and notice. The parents of a child with a disability should be "present at each IEP

meeting or [] afforded the opportunity to participate[.]" 34 C.F.R. § 300.345(a). A meeting may be conducted without either parent, however, "if the public agency is unable to convince the parents that they should attend." Id. at § 300.345(d). The Grays' position on the right to parental participation was not clearly raised in a timely fashion so the panel considered it in connection with the ultimate issue of whether D.G.'s IEPs were appropriate.

After a careful review of the record, we conclude that even if there were a technical violation regarding the requirement to schedule a meeting at a "mutually agreed [up]on" location, 34 C.F.R. § 300.345(a)(2), it did not affect the IEPs or otherwise deprive D.G. of educational benefit. See S.D., 88 F.3d at 562. Gray participated in each of the four meetings held between August and November 2002 including those in which D.G.'s 2002 IEP was drafted. The District attempted to include the parents in its meetings regarding the 2003 IEP, and offered to enable Gray's participation by telephone on those occasions when he could not or would not attend in person. Gray's claim that D.G. was denied a FAPE because the IEP team allegedly gave inadequate consideration to his suggestion that D.G. attend Milestones during the 2004-2005 school year is unsupported by the evidence.

In his appellate brief, Gray appears to raise several additional arguments,[4] including assertions that the District did not conduct meaningful assessments, did not employ individuals with sufficient experience with autism, and failed to provide D.G. with speech and occupational therapy in a timely fashion. We decline to consider

_____

[4]Gray does not seem to challenge the district court's dismissal of his counterclaims that the District violated the IDEA by not immediately complying with the panel's order. Nor could he. The IDEA requires a district to follow the provisions of the last mutually agreed upon IEP until the entire dispute is resolved. 20 U.S.C. § 1415(j). To the extent that Gray challenges the dismissal of his additional counterclaims including those for conspiracy and disability discrimination, we affirm the district court's judgment.

issues that Gray did not request the administrative panel to rule on in his post hearing brief and that were not passed on by the panel or the district court.  See Blackmon, 198 F.3d at 659.  We also do not consider allegations regarding incidents beyond the two year statute of limitations applicable to IDEA claims in Missouri.  See Strawn, 210 F.3d at 957.

Because Gray has not established an IDEA violation, his arguments regarding appropriate relief are moot, including his reimbursement request.

IV.

Accordingly, the judgment of the district court is affirmed.

_____