# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3520

_____

| | | |
|---|---|---|
| Thomas Bradley, as Natural Guardians of, and on behalf of David Bradley, a minor, individually and on behalf of themselves and all others similarly situated; Dianna Bradley, as Natural Guardians of, and on behalf of David Bradley, a minor, individually and on behalf of themselves and all others similarly situated, | * * * * * * * * * | |
| Plaintiffs - Appellants, | * * | |
| v. | * * | |
| Arkansas Department of Education; Mike Crowley, individually and in his capacity as an employee of the Arkansas Department of Education; Williford School District 39; John Does, 1 - 10, | * * * * * * * | Appeal from the United States District Court for the Eastern District of Arkansas. |
| Defendants - Appellees | * * | |
| ---------------------------------------- David Bradley, and his parents and next friend, | * * * * | |
| Plaintiff, | * * | |
| Thomas Bradley, individually and on behalf of all others similarly situated; | * * | |

Dianna Bradley, individually and on    *
behalf of all others similarly situated,    *
   *
     Plaintiffs - Appellants,    *
   *
     v.    *
   *
Arkansas Department of Education;    *
Raymond Simon, in his official    *
capacity as Director of the Department,    *
as well as individually; Diane Sydoriak,    *
in her official capacity as Director,    *
Special Education and individually;    *
Marcia Harding, in her official    *
capacity as Acting Associate Director,    *
Special Education and individually;    *
Mike Crowley, in his official capacity    *
as Administrator for Special Education    *
Monitoring and Technical Assistance    *
and individually; Williford School    *
District 39, its Superintendent and    *
Board, respectively; Bruce Evans, in his    *
official and individual capacities;    *
Clinton Madison, in his official and    *
individual capacities; Rodney Despain,    *
in his official and individual capacities;    *
Jeff Goings, in his official and    *
individual capacities; Don Coggins, in    *
his official and individual capacities;    *
Eddie Gray, in his official and    *
individual capacities,    *
   *
     Defendants - Appellees.    *

_____

Submitted:  November 17, 2005
Filed:   April 7, 2006

_____

Before MURPHY, BOWMAN, and GRUENDER, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Thomas and Dianna Bradley, on behalf of their son David Bradley, appeal from the judgment of the District Court,[1] entered after a bench trial, dismissing their claims against all defendants, including the Arkansas Department of Education (ADE); the Williford, Arkansas, School District; and several individual defendants. We affirm.

David Bradley, born in May 1981, was diagnosed at a young age with autism[2] and was, at the relevant times, a student with a disability entitled to special education and related services under the Individuals with Disabilities Education Act (IDEA or Act), 20 U.S.C. §§ 1400–1491*o*.[3] The IDEA requires that children with disabilities be afforded a free appropriate public education. "The core of the statute . . . is the cooperative process that it establishes between parents and schools." Schaffer v.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

[2]There was testimony at trial that it is likely that David's disability is high-functioning autism or Asperger's Syndrome. According to the American Psychiatric Association, autism and Asperger's Syndrome are distinct conditions, although they share some of the same characteristics. American Psychiatric Ass'n: Diagnostic and Statistical Manual of Mental Disorders 82–83 (Michael B. First, M.D., et al. eds., 4th ed. Text Revision 2000). In any event, it is without dispute that David has at least average intelligence.

[3]Except where indicated, we cite the 1994 edition of the United States Code, the version in effect when the events leading up to this litigation began. We note, however, that the Act was substantially overhauled by the IDEA Amendments of 1997, Pub. L. 105-17, 111 Stat. 37. So we cite post-1997 decisional law for legal propositions only if substantive 1997 IDEA amendments are not implicated.

Weast, 126 S. Ct. 528, 532 (2005). As we will explain, the record in this case reflects a regrettable failure of that cooperative process.

At the time of trial, there were fewer than 300 children in the entire Williford School District, kindergarten through twelfth grade.[4] David started first grade, and completed elementary school, in the Williford school system. At some point, a written individualized education program, or IEP, was developed for David. See 20 U.S.C. § 1401(a)(20) (defining IEP).[5] Through the sixth grade, David received most of his instruction in a regular classroom, supplemented by indirect services (therapy sessions and other classes not provided by his classroom teachers) and some time in a resource classroom for special education. Someone accompanied him when he changed classrooms. But when David entered the seventh grade in the fall of 1994, it was necessary for him to change classrooms by himself, and he became frustrated and anxious about going to school. In order to relieve some of David's stress, his father began going to school with David and staying there all day, sometimes staying with David in David's classroom.

The Bradleys felt that David was not learning as he should and called for a meeting of David's IEP team (parents, teachers, and others, see id.). Dissatisfied with the results of that meeting, the Bradleys called in consultant Sidney Padgett, a psychologist specializing in developmental disabilities, who had evaluated David earlier in grade school. Padgett and Rita Lee, a behavior consultant, observed David

---

[4]At oral argument, the Court was advised that the Williford School District has been consolidated into a larger district and thus no longer exists.

[5]The 1997 IDEA amendments, which became effective in the middle of this litigation, significantly broaden the IEP requirements. Compare 20 U.S.C. § 1414(d) (2000) with 20 U.S.C. § 1401(a)(20) (1994); see also 34 C.F.R. §§ 300.340–.350 (1995 & 2005). These amendments appear not to have had an impact on the formulation of David's IEPs after their effective date, and none of the parties mentions the amendments in relation to those IEPs.

and made written recommendations. The Bradleys called for another IEP meeting where the recommendations of Padgett and Lee were presented to the team. That was followed in the spring of 1995 by an annual review conference. Again dissatisfied with the response from other members of the IEP team, the Bradleys requested a due process hearing in April 1995 to address the proposed 1995–96 IEP. See id. § 1415(b)(2) (providing for an impartial due process hearing at the parents' request). The parties, together with the hearing officer, negotiated an IEP acceptable to the Bradleys, which incorporated suggestions of Padgett, Lee, and the family. By the fall of 1995, the superintendent of schools had named Bruce Evans, an English teacher and former coach, as administrative assistant and had made him responsible for supervising the implementation of David's IEP. Around this time, it was also agreed that it would be a positive step to phase out David's excessive reliance on his father, with Thomas Bradley gradually increasing the distance between himself and his son while David was at school.

After David started the eighth grade in the fall of 1995, the Bradleys concluded that the School District was not following David's IEP. Thomas Bradley filed an administrative complaint with the ADE in March 1996. Among the charges: the School District hired an aide for David without consulting the IEP team and failed to give her intensive training (although the evidence showed that the aide was trained by Padgett, the consultant chosen by the Bradleys), the software the District agreed to purchase for David's use at home was more than sixty days late, and there were problems with the integrated speech therapy and the occupational therapy the District was to provide for David. The state employees who conducted the investigation reviewed the case file; the IEP; the notes from weekly meetings held with David's teachers and others, including his parents; and David's school records. They interviewed the Bradleys and others who were involved in David's education. The investigative team found that the only charge with merit concerned David's occupational therapy. The Bradleys had located the occupational therapist for David when it was the School District's responsibility to do so. By the time the School

District contacted the therapist and arranged for payment and transportation to the therapist's office in Jonesboro (about an hour and a half away from Williford), the implementation of this IEP service was six days late. The School District was directed to provide two hours of compensatory occupational therapy.

As David's eighth-grade year was drawing to a close in the spring of 1996, David's IEP team met to review and revise the IEP in anticipation of David's ninth-grade year. The IEP for 1996–97 was far less detailed than the one for 1995–96 that had been negotiated with the hearing officer, and Thomas Bradley was not happy. In May 1996, he requested another due process hearing. He thought that the 1996–97 IEP omitted most of the positive modifications that had been included a year before. The hearing officer identified the primary issue as an alleged denial of a free appropriate public education to David because of these purported flaws in his IEP: it relied on inaccurate test data, it did not require the assistive technology (computer software) that David needed, it did not provide for extended-year speech and occupational therapies, the related services[6] were inadequate, and the behavior management plan was inadequate. Other issues included in-service training of school personnel about autism and reimbursement for an independent evaluation sought by the Bradleys.[7] Late in October, the hearing officer, rejecting Thomas Bradley's arguments, ruled in favor of the School District and ordered immediate implementation of the 1996–97 IEP. In December 1996, the Bradleys filed suit

---

[6]"Related services" are defined as transportation and other services that must be provided for a child to benefit from special education, such as counseling, therapy, and recreation. 20 U.S.C. § 1401(a)(17).

[7]On the training question, the hearing officer ruled that the issue was not justiciable in a due process hearing. That was an erroneous ruling, as counsel for the state defendants acknowledged at oral argument.

against the ADE, the Williford School District, and various individuals charging, inter alia, violations of the IDEA and the Rehabilitation Act.[8]

In April 1997, near the end of David's ninth-grade year, Thomas Bradley filed another administrative complaint with the ADE. This time he alleged that David's IEP had not been updated, effectively denying David a free appropriate public education, and that a current transition plan was not a part of David's IEP.[9] The Bradleys thought the School District was misapplying the "stay-put" provision of the IDEA, which provides for maintenance of current educational placement during the pendency of any proceedings brought under the Act. See 20 U.S.C. § 1415(e)(3)(A). This "stay-put provision ensures an uninterrupted continuity of education for a disabled child pending administrative [or judicial] resolution," unless the school and

[8]This case has been in the federal system for nearly ten years because of interlocutory appeals unrelated to the merits. First, the District Court denied the state defendants' motion to dismiss on Eleventh Amendment grounds. In an appeal, consolidated with another case, we affirmed, holding that the state had waived its Eleventh Amendment immunity and could not argue that defense on the IDEA claim. Bradley v. Ark. Dep't of Educ., 189 F.3d 745 (8th Cir. 1999). Parts of that opinion (not relevant here) were vacated for rehearing by the Court en banc. Jim C. v. Ark. Dep't of Educ., 197 F.3d 958 (8th Cir. 1999). The en banc opinion is found at Jim C. v. United States, 235 F.3d 1079 (8th Cir. 2000), cert. denied, 533 U.S. 949 (2001).

The Bradleys filed a second suit in October 2000, which was consolidated with the first. When the District Court denied qualified immunity to three ADE officials, sued in their individual capacities for damages, they filed an interlocutory appeal. We concluded that all three officials were entitled to qualified immunity on the Bradleys' claims for damages. Bradley v. Ark. Dep't of Educ., 301 F.3d 952 (8th Cir. 2002).

[9]A transition plan should call for services that assist the disabled child in preparing for life after school. See 20 U.S.C. § 1401(a)(19) (defining "transition services"). For example, one of David's plans included activities such as exploring career opportunities, working on personal finance skills, and studying for his driver's license.

the parents otherwise agree. Light v. Parkway C-2 Sch. Dist., 41 F.3d 1223, 1227 (8th Cir. 1994), cert. denied, 515 U.S. 1132 (1995). Late in June 1997, a report was issued stating that the investigation found no violations by the Williford School District: a 1997–98 IEP for the tenth grade and a current transition plan for David were both on file. In the meantime, on May 1, 1997, an article about the conflict between the Bradleys and the School District appeared in the *Jonesboro Sun* newspaper. Thomas Bradley and Evans were quoted in the article. Following that publication, the Bradleys reported harassing incidents and phone calls at their home and initiated some prosecutions of the students involved. Students who bothered David at school and could be identified were suspended or otherwise punished. There was no evidence that the defendants were involved in any of these incidents.

Effective July 1, 1997, Evans was named superintendent of the Williford schools but continued to direct David's IEP. In formulating David's 1997–98 (tenth grade) IEP, a major change was made in the plan. Previously, at the behest of his parents, David had only been graded on the work that he chose to complete, including tests. As a consequence, he was making As and Bs. A majority of the IEP team members was concerned that this practice was creating holes in David's knowledge base that would become a real problem for him, so that provision was removed. Although the Bradleys did not sign this IEP, they did not appeal it, and the School District began implementing the plan when David started the tenth grade in the fall of 1997. When graded on all work, completed or not, David began failing some of his classes.

At a December 1997 meeting about a remediation plan to close the now obvious gaps in David's learning, Thomas Bradley expressed hostility to the plan and to Evans personally. A few days later, Bradley confronted Evans in a manner that made Evans feel threatened. Evans complained to the deputy prosecutor, who filed charges against Bradley. By the time school resumed after the Christmas holiday, Bradley had been arrested and legally restrained from going into David's school.

-8-

Because he could not accompany David, Bradley refused to send his son to school. In February 1998, Bradley presented the School District with a one-page report from a psychologist who had diagnosed David with school phobia and prescribed homebound schooling. The School District resisted the recommendation. Members of David's IEP team did not feel that homebound schooling was in David's best interests, especially in terms of his socialization, or that his home was the least restrictive learning environment—the IDEA's preference—in which David could receive a free appropriate public education. See 20 U.S.C. § 1412(5)(B) (noting that disabled children, to the extent possible, should be educated in the regular classroom with children who are not disabled); see also Bd. of Educ. v. Rowley, 458 U.S. 176, 202 (1982); Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996) ("IDEA enacted a strong preference that handicapped children attend regular classes with children who are not handicapped," giving rise to a presumption in favor of placement in a public school.). The School District asked for additional information and the opportunity to get a second professional opinion. The Bradleys did not honor those requests, and when David's school principal reported him to authorities as truant, Thomas Bradley was arrested. At hearings in municipal court on both the threatening and the truancy charges in March 1998, the criminal charges for threatening Evans were dismissed. But on the truancy charges, Bradley was ordered to return David to school and not to stay at the school. According to Evans, who was present for both hearings, the municipal judge was not pleased when Thomas Bradley indicated that he did not intend to cooperate with the School District in getting the best placement for David because he thought it might jeopardize his lawsuit against the District.

Meanwhile, back on December 1 and 29, 1997, the ADE received additional requests from Thomas Bradley for due process hearings. The first of these requests challenged the School District's refusal to pay for an assistive technology evaluation

for David.[10] The hearing officer found that the District had already paid for two such evaluations, the most recent on December 11, 1996, and had scheduled a meeting of David's IEP team in February 1997 to discuss the recommendations. In addition, Evans testified at the hearing regarding a proposal to evaluate assistive technology for David in early 1998. In her report issued in January 1998, the hearing officer said there was no violation. In the complaint the ADE received on December 29, 1997, Thomas Bradley alleged that David's IEP was not appropriate and that the School District had denied David a free appropriate public education because the District had not arranged for a comprehensive evaluation of David. In March 1998, the hearing officer found that the District had performed the necessary evaluations and that the current IEP was not the one developed for the 1995–96 (eighth grade) school year, as Thomas Bradley alleged, but was developed specifically for the 1997–98 (tenth grade) school year, and the Bradleys' refusal to sign the 1997–98 IEP did not stop its implementation. According to the hearing officer, the Williford School District was not in violation of the IDEA.

On March 10, 1998, the ADE received a request from Thomas Bradley for a due process hearing on the question of David's placement. On March 31, in an interim order, the hearing officer ordered the School District to begin providing off-site instruction. The School District complied with the order, providing David with instruction at a neutral location, a fire station about three blocks from the school. The hearing officer further ordered the Bradleys to provide the School District with the qualifications of the psychologist who had diagnosed David with school phobia and to check with that psychologist about getting a full evaluation of David, to be paid for by the School District. At its option, the School District could get its own evaluation done, and the Bradleys were to make David available. As it turns out, the opinion of

---

[10]Assistive technology devices "increase, maintain, or improve functional capabilities of individuals with disabilities." 20 U.S.C. § 1401(a)(25); see also id. § 1401(a)(26) (defining assistive technology services).

the District's specialist regarding David's placement did not differ significantly from the opinion of the Bradleys' psychologist.

A full hearing was held in August 1998. Finding that both professionals agreed that homebound schooling was the appropriate placement for David, the hearing officer ordered the parties to prepare an IEP compatible with off-site schooling with full curriculum instruction and compensatory education through the summer of 1999. The School District was required to provide a teacher properly trained in educating autistic students. David's IEP was revised accordingly.

Evans set up interviews with prospective teachers. He permitted Thomas Bradley to interview the applicants separately, even though the School District had discretion under the order to choose the teacher. Evans hired the person recommended by the Bradleys and arranged to have her trained. She began instructing David twelve hours a week at his home, with a computer and software purchased by the District.

At the start of the summer in 1999, David's IEP was revised, at the request of his parents, to reduce the number of hours of instruction for his compensatory education from twelve to eight. When the fall semester began, his parents asked that it be reduced to four hours. When Evans suggested in the spring of 2000 that David take some classes at a vocational-technical school, the Bradleys were interested. In the fall of 2000, David began taking some remediation classes at the vo-tech school. The School District paid for tuition, books, and transportation, and the vo-tech school arranged for an aide. The School District also continued to provide homebound instruction, speech and occupational therapy, driving lessons, and private art lessons, including transportation when necessary. At the Bradleys' request, the School District graduated David from Williford High School in December 2000. Evans told the Bradleys that the School District's obligations to David could continue until he reached the age of twenty-one, if the parents so desired. See 20 U.S.C.

-11-

§ 1412(a)(1)(A) & (B) (2000). After David's graduation, the Bradleys never requested compensatory education from the School District, except in this consolidated lawsuit.

In February and March 2004, the District Court held a bench trial on the Bradleys' claims and issued written findings of fact and conclusions of law. The court determined that none of the defendants violated federal law. The Bradleys appeal, raising three issues under the IDEA and one under § 504 of the Rehabilitation Act.

For their first IDEA issue, the Bradleys challenge a finding by the District Court necessary to the conclusion that the Williford School District did not violate the IDEA in its handling of the education of David Bradley. The court credited the opinion of the School District's expert that David's standardized test scores showed he "made educational progress." Findings of Fact and Conclusions of Law at 11 (factual finding 73). The Bradleys argue that the evidence was insufficient to support this finding. In support of their contention, they point to David's scores on standardized tests over the years. Indeed, he did not perform well, but he did perform consistently. That is, as the School District's expert pointed out, the scores on these tests are not based on the raw number of correct answers. Instead, David's correct answers were compared with the answers of students across the country who took the same test at the same age. As the expert explained, for David to be performing consistently, he had to be learning at the same pace as his peers, that is, he was making academic progress. We see no clear error in this finding of fact. Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1035 (8th Cir. 2000) (standard of review).

The Bradleys next argue that David's IEPs "were not reasonably calculated to enable David to receive educational benefits." Appellants' Brief at 46. To begin, the Bradleys specifically challenge the determination by a hearing officer that two of the issues Thomas Bradley raised in one of his requests for a due process

hearing—teacher training and appropriate computerized instruction for David—were not justiciable in such a hearing. The District Court made no findings or conclusions on this part of the hearing officer's decision. As we have said, supra note 7, it appears that the hearing officer was mistaken, at least in part, in his ruling. But we need not consider the merits of the justiciability issue or whether it is even properly before us because we conclude that resolution of the question will not change the result. Accordingly, we proceed directly to our de novo review of the District Court's conclusion that David's IEPs were appropriate under the IDEA.

In response to the Bradleys' IEP argument, the School District first contends that the Bradleys have challenged only the 1995–96 (eighth grade) IEP in this lawsuit. In fact, the Bradleys' original complaint references only the May 1995 due process hearing on the 1995–96 IEP. In their Reply Brief, the Bradleys refer to the challenged IEP as "the 1995-96 IEP for 9th grade"—although the 1995–96 IEP was for eighth grade. Appellants' Reply Brief at 10 n.6 (emphasis added). To further muddy the waters, Thomas Bradley testified at trial that the order from the 1996 due process hearing on the 1996–97 (ninth grade) IEP was the only one being challenged in the lawsuit. Transcript at 60, 125. But we will not try to sort it all out at this stage of the litigation because we conclude that the Bradleys have asked the federal courts in their consolidated lawsuit to consider the appropriateness of the overall education provided to David by the Williford School District since the seventh grade, therefore implicating all of the IEPs from that time period. We will give the Bradleys the benefit of the doubt and conduct our review considering all of David's IEPs from the relevant period, as did the District Court.

The District Court found that the "Williford School District developed and adopted [IEPs] reasonably calculated to enable David to receive educational benefits." Findings of Fact and Conclusions of Law at 11 (factual finding 72). Although the court characterized this as a factual finding, the ultimate conclusion is a mixed question of law and fact that we review de novo, with any pure factual

-13-

findings reviewed for clear error. Gill, 217 F.3d at 1035. Notwithstanding that our review is de novo, "we must give 'due weight' to the outcome of administrative proceedings, giving particular consideration to state officials' educational judgments." Mo. Dep't of Elementary & Secondary Educ. v. Springfield R-12 Sch. Dist., 358 F.3d 992, 998 (8th Cir. 2004) (quoting Rowley, 458 U.S. at 206). We recognize that the hearing officers "had an opportunity to observe the demeanor of the witnesses," and we are mindful that it is not the place of the courts to "substitute [our] own notions of sound educational policy for those of the school authorities that [we] review." Strawn v. Mo. State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000). In none of the administrative proceedings in this case did the hearing officer find that a challenged IEP was in violation of the IDEA. (After the final due process hearing, David's IEP was inappropriate only because it was determined that his placement should be changed to homebound schooling. His IEP was revised accordingly.)

"The standard to judge whether an IEP is appropriate under IDEA is whether it offers instruction and supportive services reasonably calculated to provide some educational benefit to the student for whom it is designed." Gill, 217 F.3d at 1035 (emphasis added). The record reveals that the School District and Evans were sincere in their efforts not just to provide some educational benefit to David, but to put together IEPs that would give David superior educational benefit. Many of the suggestions of the Bradleys' consultants were incorporated into David's IEPs. The factual finding regarding David's academic progress shows not only that the IEPs were reasonably calculated to provide educational benefit to David, but that they had the desired effect. "[T]he IDEA does not require that schools attempt to maximize a child's potential, or . . . guarantee that the student actually make any progress at all." CJN v. Minneapolis Pub. Sch., 323 F.3d 630, 642 (8th Cir.), cert. denied, 540 U.S. 984 (2003). It is true that the 1996–97 IEP was less detailed than the one for the previous year, but it covered almost identical ground. In any event, the Act does not require "the furnishing of every special service necessary to maximize each

-14-

handicapped child's potential." Rowley, 458 U.S. at 199. We conclude that the IEPs were formulated in accordance with the IDEA.

To the extent the Bradleys are really challenging the implementation of the IEPs, that argument also fails. The record reveals that the persons responsible for implementing David's IEPs, Bruce Evans in particular, made every effort to provide the services called for. Evans and Thomas Bradley attended training conferences, with fees and travel expenses paid for by the School District. The District hired and trained aides for David. Weekly meetings were held with those responsible for David's education, and his parents were invited to attend. Computers and software were purchased for David's use. At school, he was allowed to leave the classroom to take a break if he felt overwhelmed and to leave class five minutes early to dress for gym. His father was permitted to stay at the school all day (until restrained by the court) to calm and refocus David as necessary. David was provided with a break room to which he could retreat when he was unable to cope with sensory stimulation from his environment. The District paid for speech and occupational therapies and private art and driving lessons, and provided transportation when necessary. It may be that the District could have done more. Thomas Bradley thought at times that too many of the School District's responsibilities fell to him because the District was not acting quickly enough. There also was some evidence that the purchased software was not being used effectively, in part because not all of David's teachers were properly trained to use it. So perhaps the District's implementation of David's IEPs, like the IEPs themselves, was not perfect. But the "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense." Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 612 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1998). We conclude that the Williford School District was not in violation of the IDEA in its implementation of David's IEPs. In sum, we hold that the IEPs, in both formulation and implementation, were reasonably calculated to enable David to receive educational benefits.

The Bradleys further challenge the IEPs because, they allege, the IEPs were developed "without the assistance of persons knowledgeable about Asperger['s]." Appellants' Brief at 49. This goes to the teacher and staff training, which the Bradleys perceived to be inadequate. The incidence of David's particular disability was low in the special education programs of Arkansas public schools in general and the Williford School District in particular, so the training may not have been as intensive or as thorough as the Bradleys would have liked. But we see no error in the District Court's factual finding that the School District "provided appropriate training for its personnel in the implementation of the IEP's." Findings of Fact and Conclusions of Law at 11 (factual finding 74). The record reflects considerable training of David's teachers, aides, and even his fellow students. Thomas Bradley wanted more. But as we have said, the IDEA does not require that parental preferences be implemented, so long as the IEP is reasonably calculated to provide some educational benefit. See Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 658 (8th Cir. 1999). If the plan is so designed, the federal courts "should not intervene in these questions of education policy." Gill, 217 F.3d at 1037. We cannot say that the IEPs were inappropriate because of a failure of training.

The Bradleys next charge that the District Court erred in dismissing their complaint without making a finding that the School District did not retaliate against them in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1994). While it is true that no such explicit finding was made, the court did conclude that the "Williford School District did not violate § 504 of the Rehabilitation Act." Findings of Fact and Conclusions of Law at 12 (conclusion of law 6). The necessary factual finding is implicit in that conclusion. We review the ultimate legal conclusion de novo and any factual findings that are material to the conclusion for clear error.

Section 504 provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that

receives federal funding. 29 U.S.C. § 794(a). To make out a case of retaliation under § 504, the Bradleys must show they were engaged in protected activity, the School District took some adverse action, and a causal connection between the activity and the District's action. See Neudecker v. Boisclair Corp., 351 F.3d 361, 363–64 (8th Cir. 2003) (citing cases).

Under the Rehabilitation Act, "to be engaged in a protected activity," the Bradleys "must have been protesting what [they] perceived as discriminatory" action taken by the School District. Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000). Threatening Evans and keeping David out of school in violation of state law likely are not protected activities. On the other hand, the Bradleys' requests under the IDEA for state investigations into David's education in Williford, their calls for due process hearings under the IDEA, and their filing an IDEA lawsuit might be protected activities for purposes of a § 504 retaliation claim. As for the alleged adverse action, the Bradleys essentially contend that David's right to a free appropriate public education under the IDEA was negatively affected by the actions of the School District. They also claim a "steady stream of adverse actions taken by the District against the Bradleys." Appellants' Brief at 57. To the extent they are relying on actions taken against someone other than David, it is not clear that such actions can support a § 504 claim. The Bradleys have identified no Eighth Circuit cases where action against a parent who is exercising IDEA rights on behalf of his disabled child has been determined to be "adverse action" for a § 504 claim of retaliation. But we need not address that question in this case because we hold that the Bradleys have not shown that any adverse action was taken *in response to* protected activity. That is, they cannot show a causal connection between the two.

Evans filed a complaint with the prosecutor's office because he felt physically threatened by Thomas Bradley. (The actual charges, it should be noted, were filed at the discretion of the prosecutor, not Evans.) The Bradleys have made no effort to show that Evans's explanation for his actions was pretextual and that he really was

punishing Thomas Bradley for seeking to vindicate David's rights under the IDEA. See Sherman, 235 F.3d at 410. We hold that the District Court clearly erred if it was suggesting otherwise when it found that Evans "filed criminal charges of terroristic threatening and disorderly conduct" and got a restraining order against Thomas Bradley "[i]n retribution" for Bradley's threat to sue Evans personally if Evans did not meet his demands regarding David's education. Findings of Fact and Conclusions of Law at 6 (factual findings 29, 30). The record belies such a finding. Evans's undisputed testimony was that he felt physically—not legally—threatened when, within a few days, Thomas Bradley told him "to stick the rights where the sun don't shine"; Bradley asked him "to step outside" and told Evans, when Evans told Bradley he was not mad at him, that "I'm certainly mad at you"; and Bradley requested a meeting with Evans and then told Evans to "[s]ave yourself a lot of trouble and put something between us." Transcript at 981, 982 (testimony of Bruce Evans). Evans testified that it was his concern for the safety of his staff and himself, with Thomas Bradley's hostility escalating with each encounter, that caused him to file an affidavit with the prosecutor's office—not Bradley's threat to sue Evans "and everybody that had ever been connected with David's education for the last eight years." Id. at 982. As for the truancy charge against Thomas Bradley, the principal had Bradley arrested because he was required by state law to do so. Evans actually resisted the filing of that charge earlier, when David was first truant, in order to talk with the Bradleys about it and because he was "reluctant to take additional action against the Bradleys." Id. at 987. Finally, we have already held that the School District did not violate David's IDEA rights, so a retaliation suit under § 504 based on IDEA violations is precluded. See Indep. Sch. Dist. No. 283, 88 F.3d at 562. Because the Bradleys cannot show that the challenged actions of the School District and Evans were taken because the Bradleys were engaged in protected activity, their retaliation claim must fail. The District Court properly dismissed the Bradleys' claim of retaliation brought under § 504 of the Rehabilitation Act.

Finally we come to the claims against the ADE, also dismissed after the District Court concluded that the state agency did not violate the IDEA or 42 U.S.C. § 1983. The contentions against the ADE involve its responsibilities under the Act to train and monitor school district personnel throughout the state.

The IDEA presently requires that the state have in place "a comprehensive system of personnel development [CSPD] that is designed to ensure an adequate supply of qualified special education, regular education, and related services personnel" consistent with the IDEA's requirements for personnel development. 20 U.S.C. § 1412(a)(14) (2000). Because the IDEA was enacted under the authority of the spending clause, see U.S. Const. art. I, § 8, cl.1, the state must be in compliance with the Act to receive federal funding. See Gill, 217 F.3d at 1035. Under the regulations, any state that has a state improvement grant issued by the United States Department of Education (USDOE) "has met the requirements" of a CSPD. 34 C.F.R. § 300.380(b) (2005). In 2003, the ADE received a five-year state improvement grant. The receipt of this grant is de facto compliance with the requirement of a CSPD and thus a defense to the Bradleys' claim for injunctive relief.

The Bradleys argue that the ADE's receipt of a state improvement grant does not bar a remedy of compensatory education for David since he was not in school when the first grant was approved in 2003. But as we have said, David's personal rights under the IDEA were not violated, regardless of the ADE's purported failures in training and monitoring while David was attending school in the Williford School District, so he cannot receive compensatory education at the state's expense for an alleged statewide failure of the ADE's special education training program. And in any event, the District Court found that Arkansas's state plans (or "assurances" when plans were no longer required), including provisions for the training of personnel, from 1994 onward have all been approved by the USDOE as in compliance with the IDEA. See Findings of Fact and Conclusions of Law at 8–9 (factual findings 44–50). These findings are not clearly erroneous.

-19-

We hold that the District Court properly dismissed all of the Bradleys' claims. The judgment is affirmed.

_____