# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 11-3774

———————————————

M.M., individually and on behalf of L.M. their son; C.M., individually and on behalf of L.M. their son

*Plaintiffs - Appellants*

v.

District 0001 Lancaster County School, also known as Lincoln Public Schools

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Nebraska - Omaha

——————————

Submitted: November 13, 2012
Filed: December 28, 2012

——————————

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.

——————————

MURPHY, Circuit Judge.

M.M. and C.M. allege that their autistic son L.M. was not provided a free and appropriate public education (FAPE) by the Lincoln Public Schools (the District) as required by the Individuals with Disabilities Act (IDEA), 20 U.S.C. §§ 1400 et seq. Dissatisfied with the District's plans for L.M., his parents placed him in a private school for his fourth grade year and requested that the District pay its costs. After an

administrative hearing officer concluded that the District had provided a FAPE for L.M.'s fourth grade year, his parents brought this action in federal district court. The court[1] held a bench trial and found that the District had provided a FAPE for L.M. and allowed his parents meaningful participation in the development of his behavior and educational plans. M.M. and C.M. appeal. After studying the voluminous record, we affirm.

I.

L.M. was diagnosed with autism as a young child and began first grade in 2006 at his neighborhood's Sheridan Elementary School which is in the District. An Individualized Education Plan (IEP) was made to address L.M.'s behavioral and learning issues during his first grade year. In that year L.M. met or exceeded the District's academic standards in almost every subject. His behavior problems were manageable, and he was with his nondisabled peers a majority of the time. He was promoted to the second grade.

A new IEP was created for L.M. for his second grade year. During that year he had increased behavioral problems and was "physically aggressive with himself or others an average of 7 times per day" during the first quarter. District personnel used calming strategies with L.M., which included taking him to a room away from other students, but he continued to engage in physically aggressive behaviors. Deb Rauner, a behavior specialist employed by the District, observed L.M. and recommended sensory breaks and visual prompts. L.M. nevertheless continued to behave aggressively. Since his second grade progress was found "sufficient" and he had exceeded district standards in several areas, L.M. was promoted to third grade.

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

L.M. returned to Sheridan for third grade, and a new IEP was developed for him. When he continued to engage in aggressive behaviors, including physically hurting staff members, district personnel increased his time away from peers and gave him less demanding academic work. L.M.'s grades were lower in third grade than in previous years, but his test results and writing samples indicated that he was making academic progress.

Before L.M. completed his third grade year, his parents took him to the Kennedy Krieger Institute (KKI). KKI is a short term rehabilitation facility located at the John Hopkins University School of Medicine. There, L.M. was assigned to the care of Dr. Sung Woo Kahng, a senior behavior analyst whose research focuses on self injurious behaviors by individuals with developmental disabilities. L.M. stayed at KKI from April to September 2009 while functional behavioral assessments were conducted on him and his medications were modified. The institute's research concluded there was a correlation between use of a calming room and increased aggressive behavior by L.M. and that his problem behaviors would decrease if a calming room was not used as a punishment.

KKI personnel developed a three level behavior plan for L.M. which eliminated use of the calming room. As Dr. Kahng explained, this plan was "developed specifically for [L.M.]. And if you were to compare that treatment to any other treatment that was for a patient on our unit at that time or at any other time, the treatment would be very, very different." L.M. was to start at level 3, but was to be demoted to level 2 if he displayed one instance of problem behavior. At level 2 he would remain in the same setting but would lose access to toys. If he engaged in four additional disruptive actions in the next five minutes, L.M. would be demoted to level 1 and placed in a 30 second baskethold.[2] He would then be moved to a portable mat in a safe area where he would remain until one minute passed without any problem

---

[2]A baskethold is described in the record as a technique by which a student is subdued by physically grabbing and holding him from behind.

behavior. This plan was implemented while L.M. was at the institute, and Dr. Kahng concluded that replacing the calming room at level 1 with a physical hold of L.M. resulted in a "95 percent reduction in his problem behaviors as compared to . . . baseline levels." Dr. Kahng further stated that during outings outside of the facility L.M.'s "problem behaviors were at near zero levels," especially when his mother was implementing the treatment.

L.M. was scheduled to return to Sheridan in the fall of 2009 as a fourth grader, and his mother presented the KKI behavior plan to the District. Deb Rauner, the District's behavior specialist, reviewed the KKI plan and expressed concern that it would not help L.M. "come up with some alternative skills so he doesn't have to misbehave." She understood the KKI plan not to permit school personnel to respond until L.M. had engaged in five aggressive behaviors. This concerned Rauner because her understanding of the literature dealing with autistic students was that a school should "respond to aggressive problem behaviors the first time." Another teacher at Sheridan was concerned that the KKI plan would allow L.M. "to hit a student or have five acts of aggressive behavior before he was removed from the room." Rauner also did not want district personnel to implement the baskethold procedure from the KKI plan because she had heard that it had resulted in deaths by asphyxiation at other schools.

District personnel reviewed L.M.'s behavior data, interviewed his teachers, and developed a behavior intervention plan for him that would be attached to his IEP. Rauner explained that she intended the district plan to "replicate the KKI plan" but to "still have some of the pieces that we thought were very, very important," such as the "replacement behavior piece." Rauner believed that L.M.'s behavior would improve if school personnel were to intervene quickly after any problem behaviors and to use the calming room. L.M.'s parents and KKI personnel expressed concern about this plan because Rauner was not a board certified behavior analyst, she had not worked extensively with L.M., and she had failed to provide a rationale for the continued use

of the calming room. L.M.'s parents insisted that KKI's recommendation to eliminate the calming room be incorporated into the district plan for their son. They met with district personnel on multiple occasions, and Rauner revised the district plan in response to their concerns. Each draft of the plan maintained the District's ability to use the calming room, however.

An IEP was adopted for L.M.'s fourth grade year at Sheridan. It outlined the District's assessment of his abilities and concluded that he had met many of the District's standards for the third grade. This included locating points on a grid, telling time, and comparing and contrasting. The IEP also developed a number of goals for L.M., such as participating in group activities, improving math competency, and increasing reading skills. It provided for a monthly report to L.M.'s parents regarding his progress. A behavior intervention plan was also attached to the finalized IEP which adopted many of KKI's suggestions, but it permitted district personnel to take L.M. to a calming room in certain instances. Like under the KKI plan, L.M. would start at level 3 and be demoted to level 2 if he engaged in problem behavior. District personnel were to model calming strategies at level 2 and move him to a different area such as the calming room. If his behavior did not improve, he would be demoted to level 1 and would have to remain seated in a safe area for one full minute without engaging in problem behavior.

L.M.'s parents disagreed with the IEP and the behavior intervention plan because the District had not adopted KKI's plan in full. The district plan allowed personnel to move L.M. to a calming room when he engaged in problem behaviors, which was contrary to the institute's recommendations. L.M.'s parents believed that the district plan would be detrimental to L.M.'s well being. They were unconvinced by the rationale given by district personnel and believed that the District was ignoring research and data that showed that L.M. would regress socially and academically if the calming room were used. In a letter to district personnel L.M.'s mother expressed concern that their plan significantly differed from the KKI plan and would result in

"adverse effects . . . and risk[] the tremendous progress he has made." She represented that in KKI's opinion the district plan would cause L.M. to "revert to the violent outbursts that caused him to leave" Sheridan.

C.M. and M.M. withdrew L.M. from the District before the start of his fourth grade year and enrolled him at the Prairie Hill Learning Center, a private Montessori school with mostly non special needs students. L.M.'s mother explained that her son "needs to attend a school where [KKI's] behavior plan (or something so similar as to allow for [L.M.]'s behaviors to be managed as indicated by the recent data from KKI) can be implemented with a staff who believes in it and is willing to work all aspects of the plan." The KKI plan was implemented for L.M. at Prairie Hill. His paraeducator at that school explained that L.M. "never had aggressions toward another student" and that "his behavior [was] under control and [he was] able to have this self-control, he [was] able to progress in his education, in his academics." According to L.M.'s parents, the KKI plan was successfully implemented at Prairie Hill where he was in his regular classroom almost all of the time and advanced socially.

L.M.'s parents requested that the District pay for L.M.'s education at Prairie Hill and for his paraeducator there. The District denied these requests, stating that Sheridan provided "the least restrictive environment" for L.M. and offered him "appropriate general and special education services." C.M. and M.M. requested a due process hearing under the IDEA and Nebraska Revised Statute § 79-1163, asserting that the District had denied L.M. a FAPE by failing to create an appropriate IEP for his fourth grade year. They also contended that the District had denied them meaningful participation in the process of creating an IEP for their son.

An administrative hearing officer held a hearing about whether the District had provided L.M. with a FAPE for his fourth grade year. After hearing testimony from KKI employees, L.M.'s parents, and district personnel, the hearing officer concluded that the District had provided a FAPE to L.M. The hearing officer noted that the

District had considered the KKI plan, had adopted portions of it, and had stated legitimate reasons for allowing district personnel to place L.M. in a calming room. The hearing officer also found that the District had acted in good faith and that "clearly" L.M. was "making some progress and receiving some educational benefit" because he had advanced from grade to grade and was meeting some of the District's educational assessments.

C.M. and M.M. challenged the administrative hearing officer's decision in federal district court. See 20 U.S.C. § 1415(i). Trial was held to the court, and the district judge stated that she would make an "independent decision," based on a preponderance of the evidence after giving "due weight" to the administrative proceedings, as to whether a FAPE had been made available to L.M. for his fourth grade year. See Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1028 (8th Cir. 2003). The court determined that the District had made a FAPE available to L.M. that year because its IEP included L.M.'s achievements, measurable goals, and behavioral strategies. While L.M.'s parents would have preferred that the District adopt the KKI plan in full, that was not required by the IDEA. Sheridan was found by the district court to be the least restrictive environment for L.M. because it was his neighborhood public school, non disabled students attended it, and L.M. would be removed from class when he became disruptive. The court also determined that C.M. and M.M. had been provided with meaningful participation in the formation of L.M.'s IEP. C.M. and M.M. appeal.

We review de novo the district court's ultimate determination of whether a FAPE was made available to L.M. Bradley ex rel. Bradley v. Ark. Dep't of Educ., 443 F.3d 965, 974 (8th Cir. 2006). Factual findings are reviewed for clear error, and "due weight" is to be given to the "outcome of administrative proceedings." Id. (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982)).

II

The IDEA requires that an IEP be created for each child with a disability at the beginning of the school year. 20 U.S.C. § 1412(a)(4); see Lathrop R-II Sch. Dist. v. Gray, 611 F.3d 419, 424 (8th Cir. 2010). The IDEA's legal requirements are fulfilled if a school district (1) complies with the law's procedures in developing an IEP, and (2) the resulting IEP is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206–07. Although the IEP must provide "some educational benefit," it need not "maximize a student's potential or provide the best possible education at public expense." Park Hill Sch. Dist. v. Dass, 655 F.3d 762, 766 (8th Cir. 2011) (citation omitted). Since each child's needs and abilities are unique, the law does not mandate the acquisition of specific knowledge or "strict equality of opportunity or services." Rowley, 458 U.S. at 198.

The IDEA also requires that students with disabilities be educated in the "least restrictive environment." 20 U.S.C. § 1412(a)(5). Congress expressed a "strong preference in favor of disabled children attending regular classes with children who are not disabled," creating a "presumption in favor of public school placement." CJN v. Minneapolis Pub. Schs., 323 F.3d 630, 641 (8th Cir. 2003). A student may be removed from the regular classroom, however, if it is necessary for the safety of other students or for the disabled child. See 20 U.S.C. § 1412(a)(5); see also Rowley, 458 U.S. at 181 n.4. The IDEA "significantly qualifies the mainstreaming requirement by stating that it should be implemented 'to the maximum extent appropriate.'" Pachl v. Seagren, 453 F.3d 1064, 1067 (8th Cir. 2006) (emphasis in Pachl) (citations omitted). The mainstreaming requirement is inapplicable if it "cannot be achieved satisfactorily." Id. at 1068 (emphasis in Pachl) (citations omitted).

Here, the district court, like the hearing officer before, concluded that the District had provided L.M. with a FAPE for his fourth grade year. L.M.'s fourth grade IEP had included his present levels of academic achievement as well as goals for his

advancement during that year. It indicated that L.M. had been advancing from year to year while at Sheridan and was meeting the District's academic criteria in many areas. The IEP also contained strategies to address L.M.'s behavior problems. These included "adult supports for self regulation," "intervention specialists," and speech language services. A detailed behavior intervention plan had also been attached to the IEP. Its plan had a three level graduated approach to addressing L.M.'s behavior problems which maintained the ability to remove him from the classroom when necessary and to take him to a calming room for his own safety as well as that of the other children.

C.M. and M.M. argue that the District did not make a FAPE available to L.M. because he would not have made any academic progress in fourth grade if he had attended Sheridan. As evidence of L.M.'s lack of progress there, his parents contend that he failed to meet his third grade math requirements and that his reading scores had shown significant decline.

Academic progress is an "important factor" in deciding "whether a disabled student's IEP was reasonably calculated to provide educational benefit." CJN, 323 F.3d at 638 (citing Rowley, 458 U.S. at 202). One of the cases in which we have previously addressed the question of whether a school district provided a FAPE to an autistic student is Gray, 611 F.3d at 421. There, a father alleged that a FAPE had not been established for his autistic son because his IEP did not contain enough detailed information or adequately address his son's disruptive behaviors. Id. at 424–26. While there had been conflicting evidence at the administrative hearing about whether the student was improving behaviorally, we concluded that he had received educational benefit. Id. at 426. Since his IEP "contained both detailed present level statements and measurable goals," the school district had provided him a FAPE. Id. at 424.

The record here shows that L.M.'s IEP would have provided him "some educational benefit" for his fourth grade year at Sheridan. Dass, 655 F.3d at 766. L.M. was advancing from year to year, and he was gaining educational skills each year. While L.M. had not completed his third grade math curriculum, his parents had removed him from Sheridan before the end of the school year to attend KKI. That likely affected his low scores. The District prepared IEPs for L.M. before each school year, and his fourth grade IEP included specific goals for him in math, reading, and speech. His parents were to be informed on a monthly basis about his progress. Teachers and other district personnel believed that L.M. would have received an educational benefit during his fourth grade at Sheridan. See Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett, 440 F.3d 1007, 1012 (8th Cir. 2006). We conclude that the record supports the district court's findings and conclusions that L.M.'s IEP was reasonably calculated to provide him some educational benefit. See CJN, 323 F.3d at 638.

L.M.'s parents also argue that he was not provided a FAPE for fourth grade because the District's behavior intervention plan for him would have allowed school personnel to use the calming room. In the parents' view the district plan would not have decreased L.M.'s disruptive behaviors because KKI had determined that the calming room caused them. When a child's learning is impeded by behavioral issues, the IDEA requires that the IEP team "consider the use of positive behavioral interventions and supports, and other strategies, including positive behavioral interventions." 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added). A failure to address behavioral issues appropriately can amount to a denial of a FAPE for a student. Clark, 315 F.3d at 1028.

It is "largely irrelevant" if the school district could have employed "more positive behavior interventions" as long as it made a "good faith effort" to help the student achieve the educational goals outlined in his IEP. CJN, 323 F.3d at 639. Although an IEP team must "consider" the results of outside evaluations, not all such

recommendations need be adopted.  K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15, 647 F.3d 795, 805–06 (8th Cir. 2011) (citation omitted).  That is because requiring a school to change methodologies based on the preferences of each parent would create "the potential that a school district could be required to provide more than one method . . . for different students whose parents had differing preferences." E.S. v. Indep. Sch. Dist., No. 196, 135 F.3d 566, 569 (8th Cir. 1998) (citation omitted).

L.M.'s IEP and behavior intervention plan included detailed strategies to address his behavior problems.  The District created his behavior intervention plan after reviewing the KKI plan and considering what would be feasible in the school setting.  The IEP team adopted the majority of the KKI plan, but maintained use of the calming room because of the belief that it was important for the safety and development of L.M.  See K.E., 647 F.3d at 805–06.  The school was only required by IDEA to consider the KKI plan, not to adopt it in its entirety.  E.S., 135 F.3d at 569.

The District maintained the ability to use the calming room based on its past experience with L.M., concern for the safety of students and staff, and perceived differences between KKI and the public school setting.  District personnel had increased the use of the calming room before L.M. had gone to KKI, and they believed that it had helped to reduce his problem behaviors at school.  District behavior specialist Rauner explained that she noticed that when district personnel "intervened and used the [calming] room . . . then it was longer before another behavior occurred." Rauner also stated that the District preferred the calming room because it avoided "injuries to staff or to students" which could occur by physically restraining a child. District personnel also believed that it was inappropriate to compare L.M.'s behavior at KKI with his likely behavior at Sheridan because KKI was in a hospital setting, and L.M. had been on different medications while he was there.  The evidence showed that the District adequately considered positive behavioral interventions and strategies and chose an appropriate behavior intervention plan for L.M.

-11-

L.M.'s parents cite Clark, 315 F.3d at 1028, in support of their argument that no FAPE was provided to their child. We concluded in Clark that a school district had failed to provide a FAPE because the challenged IEP had not included behavioral intervention for the student and substantial evidence showed that he was not progressing in his academic studies. Id. at 1029. There was however contradictory evidence in Clark about whether the student was progressing academically; every time his teacher attempted to advance his work, he was unable to complete it. Id. The record here, in contrast, shows that L.M. was progressing academically and would have received some educational benefit if the District used the behavior intervention plan attached to his IEP. The District sought to employ behavior strategies and provided detailed information to L.M.'s teachers about how to use the three level graduated approach to address his problem behaviors. The record does not show that L.M. would have been unable to complete fourth grade work at Sheridan. The district court did not err in concluding that L.M.'s fourth grade IEP would have provided him with some educational benefit.

C.M. and M.M. argue, however, that Sheridan was not the least restrictive environment for L.M. because he had spent almost all of his time in the calming room in his third grade year and his proposed fourth grade schedule would only give him 45 minutes each day of academic instruction in his regular classroom. The record nevertheless supports the district court's conclusion that Sheridan was the least restrictive environment for L.M. It was his neighborhood public school attended by both disabled and non disabled students. L.M.'s behavior intervention plan allowed him to be removed from class if he was disruptive or aggressive. While L.M. may have been mainstreamed for a larger percentage of his day at Prairie Hill, IDEA has a presumption in favor of educating a student at his neighborhood public school and the record shows that the District would have attempted to mainstream L.M. whenever possible at Sheridan. See CJN, 323 F.3d at 641.

III.

C.M. and M.M. also challenge the district court's conclusion that the District complied with IDEA's procedural requirements. They contend that they were denied meaningful participation because the District failed to disclose its reason for using the calming room. They argue that the District improperly predetermined the components of L.M.'s IEP, citing Deal v. Hamilton County Board of Education, 392 F.3d 840, 859 (6th Cir. 2004).

The IDEA requires that the parents of a child with a disability either be "present at each IEP meeting or [be] afforded the opportunity to participate." Gray, 611 F.3d at 427 (citation omitted). A school district cannot refuse to consider parents' concerns when drafting an IEP. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005). The IDEA explicitly requires school districts to include the parents in the team that drafts the IEP, to consider "the concerns of the parents for enhancing the education of their child," and to address "information about the child provided to, or by, the parents." 20 U.S.C. § 1414(d)(3)(A)(ii), (d)(4)(A)(ii)(III). A school district cannot predetermine the educational program for a disabled student before meeting with parents. Deal, 392 F.3d at 859. Such a predetermination could amount to a procedural flaw in the IEP because it could deprive parents of a meaningful "opportunity to participate in the formulation process." Gray, 611 F.3d at 424 (citation omitted).

C.M. and M.M were given notice of IEP meetings, attended them, and shared their views about L.M.'s behavior intervention plan. While they wanted the District to stop using the calming room as urged by KKI, IDEA does not mandate that parental preferences guide educational decisions. The District did not predetermine L.M.'s IEP or behavior intervention plan, and it did not refuse to listen to suggestions from L.M.'s parents or KKI. To the contrary, the District participated in numerous meetings with KKI and L.M.'s parents and adopted a behavior intervention plan for L.M. that

-13-

included almost all of the institute's recommendations. <u>See</u> <u>Fort Osage R-1 Sch. Dist.</u> <u>v. Sims ex rel. B.S.</u>, 641 F.3d 996, 1005 (8th Cir. 2011). We therefore conclude that L.M.'s parents were given a meaningful opportunity to participate in the creation of his fourth grade IEP.

IV.

Accordingly, we affirm the judgment of the district court.

_____